**SEALED**

**FILED**

# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

NOV 09 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

—oOo—

UNITED STATES OF AMERICA

v.

CHRISTOPHER JACKSON
10398 Match Ct., Sacramento, California

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

CASE NUMBER: 2:10mj327 GGH

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **November 30, 2007** in **Sacramento** County, in the Eastern District of California defendant(s) did, (Track Statutory Language of Offense)

▸ having devised and intended to devise a scheme and artifice to defraud and for obtaining money by false and fraudulent pretenses, representations, and promises, transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals for the purpose of executing such scheme and artifice

in violation of Title **18**, United States Code, Section(s) **1343**. I further state that I am a(n) Special Agent of the FBI and that this complaint is based on the following facts:

▸ **See attachment**

Continued on the attached sheet and made a part of this complaint: ☒

_Signature_

Signature of Complainant SA RICHARD SNODGRASS
FBI

Sworn to before me, and signed in my presence
November 8, 2010     at     Sacramento, California

Date                              City         State

GREGORY G. HOLLOWS U.S. MAG. JUDGE          _Signature_ GREGORY G. HOLLOWS

Name of Judge    Title of Judge              Signature of Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Richard J. Snodgrass, state the following:

I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since November of 1984 and am currently assigned to the white collar crime squad of the Sacramento office of the FBI. My duties involve the investigation of financial crimes.

During my employment with the FBI, I have participated directly and indirectly in hundreds of investigations regarding white collar criminal violations, including but not limited to, wire fraud, mail fraud, securities fraud, health care fraud, private insurance fraud, public corruption, fraud against the government, money laundering, and computer related fraud.

I have received training in white collar criminal investigative techniques and have taught classes in money laundering, forfeiture, and white collar crime investigation techniques at the FBI Academy at Quantico, Virginia, and elsewhere.

1. In September of 2009, I interviewed three individuals whose identities are known to me. To protect their privacy as crime victims, they are hereinafter referred to as W1, W2, and W3.

2. W1 told me she met a male by the name of Chris Jackson in 2007. Jackson operated an investment club known as Genesis Innovations and conducted the club's business at offices located at 721 W. Del Paso Blvd., Sacramento, California. W1 personally met with Jackson at the Del Paso address. During her meeting with Jackson, Jackson told her he could invest her money in the purchase of land for the purpose of developing residential housing and could pay her a rate of return of 14% per year for a period of three years. W1 decided to invest with Jackson and, on November 30, 2007, caused the a wire transfer of $240,000 from her 401(k) account, through an independent individual retirement account (IRA) administrator, doing business as Entrust Administration (Entrust), to the Bank of America account of Genesis Innovations (Genesis).

3. W1 told me she received purported interest payments on an inconsistent basis over the following year, after which time the interest payments ceased. W1 spoke to Jackson regarding the missed payments. Jackson told her he had no money to pay her. W1 has not received her return of principal nor further interest payments.

4. W2 personally met with Chris Jackson in at a restaurant in Sacramento, and thereafter at an office located at 721 W. Del Paso Blvd., in 2008. During these meetings Jackson told W2 he could invest her money in land development. Jackson told her an investment in land was a good decision because, unlike the stock market, land did not lose value. Jackson promised to double the rate of return W2 was currently earning on her IRA, promising a 14% rate of return, payable on a quarterly basis, for at least two years. W2 decided to invest with Jackson and, on July 9, 2008, caused a wire transfer of $ 295,000 from her IRA account, through Entrust, to the Genesis

bank account.

5.  W2 told me she received purported interest payments, made inconsistently and in amounts far below that promised by Jackson, through February of 2009. Thereafter, W2 received no additional purported interest payments. W2 told me the payments made to her totaled no more than $20,000. Subsequent to February 2009, W2 has spoken with Jackson very infrequently. Jackson has told W2 he does not have the money to pay her. W2 has not received the return of her principal.

6.  W3 met personally with Chris Jackson in Sacramento, California. Jackson told W3 he could invest money for W3 in the purchase of raw land for the purpose of residential and commercial real estate development. Jackson told W3 his investment monies would be secured by real estate holdings. Jackson told W3 he would be paid at a rate of return of 14% and would be repaid his investment principal at anytime upon request. W3 decided to invest with Jackson and, on August 23, 2006, caused the wire transfer of $149,880 from his 401(k) account, through Entrust, to the Genesis bank account. Pursuant to his investment with Jackson, Jackson presented W3 with promissory notes obligating Genesis with payment of interest and repayment of principal. These notes appeared to be signed by an woman initialed "F.J.E." W3 told me he questioned Jackson as to the role of F.J.E., to which Jackson replied F.J.E. played no role and Jackson controlled the investment with Genesis.

7.  W3 told me he has received one purported interest payment subsequent to causing the money to be wired to Genesis and, after making more than one written demand for return of his principal, has not been repaid his principal as promised.

8.  I reviewed business records of Entrust Administration Group ("Entrust"), which was a financial intermediary. Entrust is not a subject in my investigation, but, rather, an entity whose records help establish the jurisdictional element of an interstate wiring. Entrust's records reflected transfer, by wire, of monies from W1, W2, and W3 as described above, to a bank account in the name of Genesis Innovations, held at Bank of America.

9.  I reviewed wire records from the Federal Reserve Bank of New York. Analysis of these records revealed that each wire transfer referred to in paragraphs 2, 4, 6, and 8 above was transmitted interstate having originated at financial institutions located outside of the state of New Jersey and each having been routed through the Federal Reserve Wire Network's data center located in East Rutherford, New Jersey.

10.  I reviewed records from Bank of America reflecting account activity for Genesis Innovations. These records reflected the signors on this account to be, among others, Chris Jackson and a female.

11.  On October 23, 2009, I interviewed the female signatory on the Genesis Innovations account at Bank of America. Her initials were "F.J.." She told me she had created the limited

2

liability corporation known as Genesis Innovations, but had no role in its operation. She told me she opened the bank account of Genesis Innovations at Bank of America while accompanied by and at the direction of Chris Jackson. She told me that initially, she wrote checks from the Genesis account, but only at the direction Jackson and that she later turned the checkbook over to Jackson. She told me that she also has used the name "F.J.E.."

12. I conducted a thorough analysis of the Genesis bank account and traced investment monies originating with W1, W2, and W3 into the Genesis account and, as to each deposit, determined, through records of debits on that same account, that only a fraction of monies invested by W1, W2, or W3 were applied to investment in the purchase of land or other cognizable real estate related expenses. Instead, this is what happened:

    a. W1's investment of $240,000 was credited to the account on November 30, 2007. Analysis of the debits subsequent to that deposit reveal that $35,000 appears to have been used for real estate development purposes and that $205,000 was used to make, among other payments, purported interest payments to prior investors and to pay for personal expenses associated with Jackson and others to include sports event tickets, air travel, and fine dining.

    b. W2's investment of $295,000 was credited to the account on July 9, 2007. Analysis of debits subsequent to that deposit reveal that $130,000 appears to have been used for real estate development related expenses. The remaining $165,000 in monies were used to make payments of, among others, purported interest returns to prior investors and to fund personal expenses associated with Chris Jackson and others, to include payments to Target, Wynn Hotel, and a limousine service.

    c. W3's investment of $149,880 was credited to the account and commingled with other investor funds deposited between August 8, 2006 and September 25, 2006. Total commingled funds equaled $480,000. Of the $480,000, only $150,000 were used for cognizable real estate related expenses. The remaining $330,000 in monies were used to pay prior investors purported interest returns, to fund personal expenses associated with Chris Jackson and others to include payments to Christian Dior, Wynn hotel, Bellagio hotel, and Cartier, and to cover other miscellaneous expenses.

13. From these bank records I was able to ascertain the identity of several additional investors and the sum of their investments. I have interviewed several of these additionally identified investors. Each of these investors related to me nearly identical facts as those related to me by W1, W2, and W3 regarding representations made to them by Chris Jackson as well as the identical end result of the failure to be paid promised returns or principal.

14. Analysis of bank records for Genesis reveals deposits of monies appearing to have originated from investors totaling approximately $11 million for the period of 2005 through 2009. During this same period, approximately $2.5 million appears to have been used for real estate development related expenses and that, on a consistent basis, debits of the account were

3

made for the purpose of paying purported interest returns to some investors and that the origin of monies used for this purpose was not from profits made through developing real estate, but, rather, the "investments" made by other victims. Also gleaned from these records is that, on a consistent basis throughout the above-referenced time period, significant monies from the account were used to fund the lifestyle of Chris Jackson, to include, among other personal expenses, the leasing of Lamborghini and Range Rover automobiles, the purchase of a BMW automobile, frequent dining at high-end eating establishments, lodging at luxury hotels, the purchase of expensive diamond jewelry, and the purchase of significant home improvements.

15. On November 6, 2009, I interviewed Chris Jackson. Jackson told me he controlled the bank account of Genesis Innovations and that he solicited investments from individuals and told them their monies would be used to invest in the construction of residential homes for resale. Jackson told me he continued to solicit investors after he became aware that prior investors were not receiving their promised returns.

16. I believe the facts presented above constitute probable cause to believe Chris Jackson has committed violations of Title 18, U.S.C., Section 1343, to wit: Chris Jackson devised a scheme or artifice to obtain money by false pretenses, representations, or promises, and caused to be transmitted by means of wire communication in interstate commerce a signal for the purpose of executing such a scheme.

17. Over the past several months, I have spoken to Mr. Jackson on a number of occasions, through counsel, and, with counsel's permission, directly. Recently, Mr. Jackson stopped returning my calls and I have learned that Mr. Jackson has been behaving erratically. I therefore request that this affidavit, complaint, and the resulting warrant be maintained under seal until his

//

//

//

//

//

//

//

//

//

4

arrest, so that Mr. Jackson will learn of the warrant only from law enforcement at the time of his arrest. In my judgment, this will be the best way to safely and efficiently bring him before the Court.

The foregoing is true and correct.

_____
RICHARD SNODGRASS
Special Agent, FBI


Approved as to form,

_____
MATTHEW D. SEGAL
Assistant U.S. Attorney


Sworn and subscribed before me
this 8th day of November, 2010.

__GREGORY G. HOLLOWS__
HON. GREGORY G. HOLLOWS
U.S. Magistrate Judge

5